HOODLUMS WELDING HOODS, LLC,      )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        No. 4:08 CV 893 DDN
                                  )
REDTAIL INTERNATIONAL, LLC,       )
                                  )
                Defendant.        )


**MEMORANDUM AND ORDER**

    This action is before the court on the motions of plaintiff
Hoodlums Welding Hoods, LLC, for claim construction (Doc. 39) and for
leave to file its first amended complaint (Doc. 58). Also before the
court is the joint motion of Sherrill Law Offices, PLLC, and Harness,
Dickey & Pierce, P.L.C., to withdraw as counsel for Redtail
International. (Doc. 62.) The parties have consented to the exercise
of plenary authority by the undersigned United States Magistrate Judge
pursuant to 28 U.S.C. § 636(c). (Doc. 17.) The court held a <u>Markman</u>
hearing on June 16, 2009.


**I.  BACKGROUND**

    Hoodlums Welding Hoods (Hoodlums) brought this action against
Redtail International (Redtail) for copyright infringement, trademark
infringement and unfair competition, patent infringement, and false
marking. (Doc. 1.) According to the eleven-count complaint, Hoodlums'
exclusive licensee, For Fun Welding, Inc., hired Redtail to manufacture
welding helmets that incorporated the original artistic work of Kevin
Inget and Steven Robinson. (<u>Id.</u> at ¶ 8.) Hoodlums alleges that Redtail
manufactured these masks for its own benefit. (<u>Id.</u> at ¶ 9.) In
particular, Hoodlums alleges that Redtail marketed and sold, as its own,
a red skull welding helmet that incorporated the original artistic work
of Inget and Robinson. (<u>Id.</u> at ¶ 10.) Inget and Robinson, along with
Peggy Caserta, are the three members of Hoodlums. (<u>Id.</u> at ¶ 6.)

    In Counts I-IV, Hoodlums asserts claims of copyright infringement
under 17 U.S.C. §§ 501-505. (<u>Id.</u> at 3-9.) Each separate count of

copyright infringement relates to a unique copyright registration. (Id.)  In Count V, Hoodlums asserts a claim of trademark infringement under 15 U.S.C. § 1114, alleging Redtail used the Hoodlums mark without its consent.  (Id. at 9-10.)  In Count VI, Hoodlums asserts a claim under the Lanham Act, 15 U.S.C. § 1125.  (Id. at 10-11.)  In Counts VII-VIII, Hoodlums asserts claims of patent infringement under 35 U.S.C. § 271, alleging Redtail infringed the '972 and '260 patents, respectively.  (Id. at 11-13.)  In Count IX, Hoodlums asserts a claim for counterfeit marking under 35 U.S.C. § 292, alleging Redtail affixed a false label to the helmets.  (Id. at 13-14.)  In Count X, Hoodlums asserts a claim of trademark infringement under common law.  (Id. at 15.)  In Count XI, Hoodlums asserts a claim of unfair competition under Missouri common law.  (Id. at 15-16.)  Redtail denies these allegations. (Doc. 25.)

The court has subject matter jurisdiction based on plaintiff's allegations of copyright, trademark, and patent infringement.  See 28 U.S.C. § 1338.  The court has subject matter jurisdiction over Hoodlums' related state law claims through supplemental jurisdiction.  See 28 U.S.C. § 1367; Cossette v. Minn. Power & Light, 188 F.3d 964, 973 (8th Cir. 1999).

## II.  MOTION TO AMEND

Hoodlums moves for leave to file its revised first amended complaint.  The amended complaint seeks to add two new allegations: (1) Redtail's president, John Kerry Poucher, solicited For Fun Welding and induced it to breach its contract with Hoodlums, and (2) Redtail was selling additional infringing welding helmets.   In light of these allegations, Hoodlums seeks to add Poucher as a defendant, and to include claims against Poucher for contributory copyright infringement (proposed Counts XII-XV), inducement of patent infringement (proposed Counts XVI-XVII), and interference with a business relationship (proposed Count XVIII).  Hoodlums argues that it first learned these alleged facts during the course of discovery, that Redtail will not be prejudiced by their inclusion, and that no further discovery is needed on these new claims.  Hoodlums also argues that venue and personal

jurisdiction are proper, because Poucher was an alter-ego of Redtail. (Docs. 59, 64.)

In response, Redtail argues that adding Poucher as a defendant would be futile. In particular, Redtail argues that venue and personal jurisdiction would be improper because Poucher does not reside in Missouri and has not had any contacts with the state. Redtail also argues that Hoodlums' motion to amend assumes facts not in evidence. (Docs. 60, 74.)

## III. DISCUSSION

The Federal Rules of Civil Procedure support a liberal policy on amendments to pleadings. Dennis v. Dillard Dep't Stores, Inc., 207 F.3d 523, 525 (8th Cir. 2000). Before a responsive pleading has been filed, a party may amend its pleadings once as a matter of course. Fed. R. Civ. P. 15(a). In this case, Redtail has answered the complaint, and the lawsuit has been placed on the trial calendar. Under the circumstances, Hoodlums may amend its pleadings only by leave of court. Id. Under Rule 15, leave shall be given where justice so requires. Id.; Forman v. Davis, 371 U.S. 178, 182 (1962).

A district court may deny leave to amend only for a limited number of reasons. See Dennis, 207 F.3d at 525. Undue delay, the moving party's bad faith or dilatory motive, a repeated failure to cure the deficiencies through previous amendments, futility of the amendment, or undue prejudice to the opposing party, justify denying a motion to amend. Id. Delay alone provides insufficient grounds to deny leave to amend. Id. Likewise, the "adverse party's burden of undertaking discovery, standing alone," provides insufficient grounds to deny leave to amend. Id. The party opposing a motion to amend must show the amendment will create unfair prejudice. Id. That said, any prejudice to the non-moving party must also be weighed against prejudice to the moving party by denying the amendment. Bell v. Allstate Life Ins. Co., 160 F.3d 452, 454 (8th Cir. 1998).

Redtail argues the motion to amend should be denied as futile, because venue would be improper as to Poucher. In a patent infringement action, venue is proper in any judicial district where the defendant

resides, or any district where the defendant has committed acts of infringement and has a regular and established place of business. 28 U.S.C. § 1400(b). In cases involving the substance of patent law, the law of the Federal Circuit governs jurisdictional questions. <u>Inamed Corp. v. Kuzmak</u>, 249 F.3d 1356, 1359 (Fed. Cir. 2001). Under Federal Circuit law, "[w]hen a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted. . . ." <u>Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.</u>, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006). To satisfy this burden, the party must offer sufficient facts in support of the amended pleading such that the claim could survive a dispositive pretrial motion. <u>Id.</u> When faced with a motion to dismiss for improper venue, the court accepts the allegations in the complaint as true. <u>Hoover Group, Inc. v. Custom Metalcraft, Inc.</u>, 84 F.3d 1408, 1410 (Fed. Cir. 1996).

In its proposed first amended complaint, Hoodlums alleges that Poucher, as the president of Redtail, actively and knowingly induced the company to manufacture infringing welding helmets for the company's benefit. (Doc. 58, Ex. 1 at ¶ 15.) In a revision, Hoodlums further alleges that Poucher was the alter-ego of Redtail. (Doc. 64 at 3, ¶ 16.) In particular, Hoodlums alleges that Poucher undercapitalized Redtail, exercised sole control of the company's actions, was the sole beneficiary of Redtail's infringing activities, and ignored corporate formalities. (<u>Id.</u>) In his deposition, Poucher noted that he and one other person were the only two employees of Redtail. (Doc. 71, Ex. B at 3; Poucher depo. at 68-69.)

A court will disregard the corporate form when an individual so dominates a corporation, such that the corporation is a mere instrument of that person, and indistinct from that person. <u>Mobius Mgmt. Sys., Inc. v. W. Physician Search, L.L.C.</u>, 175 S.W.3d 186, 188 (Mo. Ct. App. 2005). Inadequate capitalization provides circumstantial evidence of an improper corporate purpose, and can provide further support for piercing the corporate veil. <u>Id.</u> at 188-89. Looking to <u>Mobius Management Systems</u> and accepting the above allegations as true, Hoodlums has pled sufficient facts to show that Poucher was the alter-ego of

Redtail.  See Hoover Group, Inc., 84 F.3d at 1411 ("[T]he allegations
of the complaint with respect to Mr. Holden's ownership, control, and
active management of the corporation provide sufficient basis for
finding that venue was proper under §§ 1400(b) and 1391(c).").

As the alter-ego of the corporation, if venue is proper as to
Redtail, venue is also proper as to Poucher.  Id. at 1410; Minn. Mining
& Mfg. Co. v. Eco Chem, Inc., 757 F.2d 1256, 1265 (Fed. Cir. 1985)
("[W]e see no reason why venue is not proper with regard to individual
stockholders (who are alter egos of the corporation) by virtue of the
corporation's acts where venue would be proper as to a corporate parent
or affiliate.").  The remaining question, therefore, is whether venue
is proper as to Redtail.

As noted above, venue is proper in any judicial district where the
defendant resides.  28 U.S.C. § 1400(b).  For venue purposes, a
corporate defendant resides "in any judicial district in which it is
subject to personal jurisdiction at the time the action is commenced."
28 U.S.C. § 1391(c).  If a state has more than one judicial district,
the corporation resides in any district in that state within which its
contacts would be sufficient to subject it to personal jurisdiction if
that district were a separate state.  Id.

To subject an out-of-state defendant to personal jurisdiction, due
process requires that the defendant have certain minimum contacts with
the forum state, such that maintaining the lawsuit does not offend
traditional notions of fair play and substantial justice.  Inamed, 249
F.3d at 1360 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316
(1945)).  The "minimum contacts" requirement focuses on (1) whether the
defendant has purposefully directed its activities at residents of the
forum, and (2) whether the litigation results from alleged injuries that
arise out of, or relate to those activities.  Id.  The "fair play and
substantial justice" requirement focuses on (3) whether the assertion
of personal jurisdiction is reasonable and fair to the defendant.  Id.
Together, these three factors inform whether the exercise of personal
jurisdiction over an out-of-state defendant satisfies due process in a
patent case.  Silent Drive, Inc. v. Strong Indus., Inc., 326 F.3d 1194,
1201-02 (Fed. Cir. 2003).

In its proposed first amended complaint, Hoodlums alleges that Redtail is subject to personal jurisdiction in this district. (Doc. 58, Ex. B at ¶ 3.) In particular, Hoodlums alleges Redtail (1) conducted business in this district, (2) infringed, contributed to the infringement, and/or actively induced others to infringe its products in this district, (3) sold the infringing product in this district, and (4) operated an interactive website that was directed to residents of the district.[1] (_Id._) According to the complaint, residents of this district can review detailed information about Redtail, exchange e-mail with Redtail, and purchase Redtail products from the company's website. (_Id._)

Accepting these allegations as true, venue is proper as to Redtail in this district. Hoodlums alleges that Redtail has sold the allegedly infringing product in this district. When a plaintiff demonstrates that the defendant has sold the allegedly infringing product in the forum state, the forum may exercise personal jurisdiction over the defendant. _TriStrata Tech., Inc. v. Emulgen Labs., Inc._, 537 F. Supp. 2d 635, 641 (D. Del. 2008). The reasoning behind this rule is straightforward. _See id._ at n.3. Under patent law, patent infringement occurs where the allegedly infringing sales are made. _N. Am. Philips Corp. v. Am. Vending Sales, Inc._, 35 F.3d 1576, 1578-79 (Fed. Cir. 1994). In other words, "to sell an infringing article to a buyer in [Missouri] is to commit a tort there (though not necessarily only there)." _Id._ at 1579. The commission of a tort in the forum state, in turn, exposes the defendant to personal jurisdiction. _TriStrata_, 537 F. Supp. 2d at 641 n.3. After all, when a company sells its products in a state, the alleged infringer has fair warning that it can be sued there. _Id._; _see also Beverly Hills Fan Co. v. Royal Sovereign Corp._, 21 F.3d 1558, 1566 (Fed. Cir. 1994) (If a company delivers its products into the stream of

---

[1]There are three categories of Internet sites: 1) interactive sites, which are used to conduct business over the Internet; 2) semi-interactive sites, which allow an exchange of information with the host computer; and 3) passive sites, which do not conduct business, and do not allow any exchange of information between the user and the host computer. _See Enter. Rent-A-Car Co. v. Stowell_, 137 F. Supp. 2d 1151, 1155 (E.D. Mo. 2001).

commerce with the expectation that they will be purchased by consumers in the forum state, the forum state does not exceed its powers under the Due Process Clause by asserting personal jurisdiction over the corporation.).

Hoodlums has also alleged that Redtail operated an interactive website, directed to Missouri residents. Operating a highly interactive website that targets forum residents and directs them to enter into contracts will subject a defendant to personal jurisdiction. <u>Enter. Rent-A-Car Co. v. U-Haul Int'l., Inc.</u>, 327 F. Supp. 2d 1032, 1041 (E.D. Mo. 2004). "If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper." <u>Zippo Mfg. Co. v. Zippo Dot Com, Inc.</u>, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). Taken together, these two allegations, accepted as true, establish that Redtail has purposefully directed activities at the residents of this forum.

**Arising Out of, or Relating To**

The exercise of personal jurisdiction also requires that the action arise out of, or relate to the defendant's activities with the forum state. <u>Elecs. for Imaging, Inc. v. Coyle</u>, 340 F.3d 1344, 1350 (Fed. Cir. 2003).

In this case, Hoodlums has sued Redtail for, among other things, infringing the patents and trademarks associated with its welding helmets. (Doc. 1.) Redtail's alleged contacts with this district relate to the sale of the allegedly infringing product. (Doc. 58, Ex. B at ¶ 3.) This action arises out of Redtail's alleged activities with the Eastern District of Missouri.

**Reasonable and Fair**

If a court concludes that the defendant has purposefully directed activities at residents of the forum, and that the litigation results from alleged injuries arising out of, or relating to those activities, the court must then decide whether exercising jurisdiction would comport with fair play and substantial justice. <u>Campbell Pet Co. v. Miale</u>, 542

F.3d 879, 884 (Fed. Cir. 2008).  When a defendant cites this test to avoid jurisdiction, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  Id.  Several factors inform whether the exercise of jurisdiction would be unreasonable: (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.  Inamed, 249 F.3d at 1363.  The defendant should not be able to avoid jurisdiction based on unreasonableness, except in the rarest of circumstances.  Campbell Pet, 542 F.3d at 884.

Looking to the five factors outlined above, jurisdiction is not unreasonable.  First, the burden on Redtail is not particularly significant - Minnesota is not that far from Missouri.  See Beverly Hills Fan, 21 F.3d at 1569 (finding burden on New Jersey defendant not particularly significant, where forum was Virginia).  Second, Missouri has a substantial interest in protecting its residents and corporations from infringing products.  See N. Am. Philips Corp, 35 F.3d at 1580 (The forum "clearly has an interest in prohibiting the importation of infringing articles into its territory. . . .").  Third, Hoodlums has a clear interest in protecting its intellectual property.  Fourth, Hoodlums filed this action over a year ago, and four months before Redtail filed a related case in the district of Minnesota.  (Doc. 29.)  At this point in the proceedings, relinquishing jurisdiction would not contribute to judicial efficiency.  Fifth, this action primarily concerns federal intellectual property law, presenting no conflict between the interests of Minnesota and Missouri in advancing their own substantive law.  See Elecs. for Imaging, 340 F.3d at 1352 (noting the relative uniformity of federal patent law).

This is not one of those rare situations where the exercise of jurisdiction would be unreasonable.  Because the motion to amend is not futile, the motion to amend is granted in its entirety.[2]

## IV.  THE '260 AND '972 PATENTS

On October 16, 1998, Robinson and Inget filed an application for a design patent for a skull welding helmet. (Doc. 44, Ex. A at 2.)  On May 16, 2000, they obtained a patent on the design, patent number 425,260 (the '260 patent).  (Id.)  The '260 patent claims the "ornamental design for a skull welding helmet, as shown and described." (Id.)  This is the patent's only claim. (See id.)  The description of the patent includes six drawings of the helmet. (Id. at 3-5.)

On August 20, 2003, Robinson and Inget filed an application for a utility patent for a method of making a welding helmet. (Doc. 44, Ex. B at 2.)  On March 25, 2008, they obtained a patent on the method, patent number 7,346,972 (the '972 patent). (Id.)  The '972 patent makes four claims:

> **1.**  A method of making a welding helmet having animal skull facial features comprising:
> preparing a mold for molding the welding helmet having a reverse structure of an animal skull facial features, which animal skull facial features include a nose feature and a mouth feature and in which there is an area for receiving a welding helmet lens in the area that would otherwise contain eye facial features;
> molding a plastic material in the mold to create a welding helmet having the animal skull facial features on the exterior; and
> fitting a welding helmet lens to the welding helmet in the area for receiving a welding helmet lens.
>
> **2.**  The method of claim[] **1** in which the animal skull facial features include mammalian facial features.

_____

[2]Poucher may renew his motion to dismiss for improper venue if discovery reveals that some of the alleged facts are not true. See Streamlight, Inc. v. ADT Tools, Inc., No. Civ. A 03-1481, 2003 WL 22594316, at *5 (E.D. Pa. Oct. 9, 2003) (permitting the defendant to renew his motion to dismiss for improper venue at the close of discovery).

**3**.     The method of claim **1** in which the animal skull facial features include human facial features.

**4**.     The method of claim **1** in which the animal skull facial features include non-human facial features.

(<u>Id.</u> at 8.)


**Claims at Issue**

The parties agree on the meaning of the terms "animal" and "non-human," as found in the claims.  (Doc. 37, Ex. A at 2.)  The parties define "animal" as "[a] living organism distinct from plants, including but not limited to humans, gorillas or dogs, as shown in Figures 5 through 9 of the '972 patent."  (<u>Id.</u>)  The parties define "non-human" as "[a]ll living things other than humans."  (<u>Id.</u>)  The parties disagree, however, on the meaning of six other terms found within the four claims of the '972 patent:

1)     The meaning of the term "skull facial features" found in each claim.

2)     The meaning of the term "mammalian" found in claim 2.

3)     The meaning of the term "human" found in claim 3.

4)     The meaning of the term "facial features" found in each claim.

5)     The meaning of the term "nose feature" found in claim 1.

6)     The meaning of the term "mouth feature" found in claim 1.

(Doc. 37, Ex. B at 2-7.)


## V.   MOTION FOR CLAIM CONSTRUCTION

Hoodlums moves the court to construe the six disputed terms of the '972 utility patent.   The company argues that the court should only consider the intrinsic evidence when construing these six terms. Because the intrinsic evidence resolves any ambiguity in meaning, Hoodlums argues that it would be improper to rely on extrinsic evidence. Hoodlums also moves the court to construe the '260 design patent.   The company argues that construction of the design patent should be limited to its illustration and figures, and that the court should not attempt to describe the patent drawings.   Any such effort, it argues, would emphasize particular features at the expense of others.  (Docs. 41, 47.)

Redtail argues that the intrinsic evidence does not provide any assistance for construing the terms of the '972 patent. As a result, the company argues that extrinsic evidence is necessary to construe the terms at issue. Redtail also argues that the '260 design patent should be construed by using the verbal translation technique, because the design can be accurately described by a few simple words. (Doc. 44.)

## VI.  DISCUSSION

### A.  Construing Utility Patent Claims

Claim construction is a matter of law, reserved for the court. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). There are two types of evidence available to a court construing claims in a patent: intrinsic evidence and extrinsic evidence. Id. Intrinsic evidence includes the claims, the patent specification, and the prosecution history. Id. Extrinsic evidence is any evidence external to the patent and its prosecution history, and commonly includes expert and inventor testimony, dictionaries, and learned treatises. Phillips v. AWH Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc). Between the two types of evidence, "intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics, 90 F.3d at 1582.

When construing claims, the court first looks to the intrinsic evidence, particularly the words of the claims themselves. Id. After all, "the claims of a patent define the invention. . . . ." Phillips, 415 F.3d at 1312. The words of the claims are generally given their ordinary and customary meaning. Id. The ordinary and customary meaning of a word "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. . . ." Id. at 1313. The patent owner may, however, assign a different meaning to the terms in a claim, provided this special definition is clearly stated in either the patent specification or file history. Vitronics, 90 F.3d at 1582.

Beyond the claims, the court must also consider the specification. Id. "Claims must be read in view of the specification, of which they are a part." Markman v. Westview Instruments, Inc., 52 F.3d 967, 979

(Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). If the specification defines a term, either expressly or implicitly, that special definition usually controls. Vitronics, 90 F.3d at 1582. The specification is particularly insightful if the inventor has used a term in a manner inconsistent with its ordinary meaning. Id. For that reason, the specification "is the single best guide to the meaning of a disputed term." Id. Yet, while the court must interpret claims in light of the specification, it must avoid using the specification to read limitations into the claims. Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).

If in evidence, the court may also consider the prosecution history. Vitronics, 90 F.3d at 1582. The prosecution history is the complete record of the proceedings before the Patent and Trademark Office (PTO), which includes the prior art cited during the patent examination and any express representations the applicant made concerning the scope of the claims. Phillips, 415 F.3d at 1317; Id. Like the specification, the prosecution history provides evidence of how the inventor and the PTO understood the patent, which helps to determine the meaning of claims. Phillips, 415 F.3d at 1317; Vitronics, 90 F.3d at 1582. On the other hand, the prosecution history often lacks the clarity of the specification, and is therefore "less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

In most instances, the intrinsic evidence will be sufficient to resolve any ambiguity in a disputed claim term. Vitronics, 90 F.3d at 1583. Where that is the case, the court may not consider extrinsic evidence. Id. "[W]here the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." Id. The court can consider the extrinsic evidence only if there is still some genuine ambiguity in the claims. Id. at 1584. Among the different types of extrinsic evidence, dictionaries "hold a special place and may sometimes be considered along with the intrinsic evidence." Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1332 n.1 (Fed. Cir. 2001). Because they are "worthy of special note," the court may consult dictionaries at any time, provided the dictionary definition does not contradict a definition otherwise

required by a reading of the patent documents.  <u>Vitronics</u>, 90 F.3d at
1584 n.6.

## 1.  "Skull Facial Features"

Hoodlums defines "skull facial features" as "[t]he bones of the
face including but not limited to the skull facial features shown in
Figures 5 through 9 of the '972 patent."  (Doc. 37, Ex. B at 2.)
Redtail defines "skull facial features" as the "[p]rominent and
distinctive characteristics of the bones underlying the face."  (<u>Id.</u>)

The term "skull facial feature" is found in each of the four claims
of the '972 patent.  In claim 1, the patent language declares that
animal skull facial features "<u>include</u> a nose feature and a mouth feature
and in which there is an area for receiving a welding helmet lens in the
area that would otherwise contain eye facial features." (Doc. 44, Ex.
B at 8) (emphasis added).  In claims 2, 3, and 4, respectively, the
patent language notes that animal skull facial features "<u>include</u>
mammalian facial features," "<u>include</u> human facial features," and
"<u>include</u> non-human facial features." (<u>Id.</u>) (emphasis added).

The word "include" means the same thing as the word "comprise" or
"comprising."  <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 314 F.3d
1313, 1344-45 (Fed. Cir. 2003).  And when a claim uses an open
transition phrase, such as "comprising," the claim's scope may cover
additional, unlisted elements.  <u>AFG Indus., Inc. v. Cardinal IG Co.</u>, 239
F.3d 1239, 1245 (Fed. Cir. 2001).  "The claim term 'including' is
synonymous with 'comprising,' thereby permitting the inclusion of
unnamed components."  <u>Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg.
Corp.</u>, 123 F.3d 1445, 1451 (Fed. Cir. 1997).  In contrast, when a claim
uses a closed transition phrase, such as "consisting of," the claim's
scope does not include any elements, steps, or traits that were not
listed in the claim.  <u>AFG Indus.</u>, 239 F.3d at 1245.

In the specification, the patent points to Figures 5, 8, and 9, as
showing "one embodiment having a human skull shape **34**." (Doc. 44, Ex.
B at 7.)  The language in the specification highlights the "jaw portion"
of the skull found in this embodiment. (<u>Id.</u>)  When a specification
describes a preferred embodiment, the court should construe the patent

- 13 -

claims to include that embodiment.  See On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").  Beyond the embodiments already illustrated in the patent, the specification notes "that modifications and variations may readily occur to those skilled in the art. . . ."  (Doc. 44, Ex. B at 8.)

Taken together, the term "skull facial features" is inclusive, with references to a nose feature, a mouth feature, and a jaw portion.  The specification's reference to the jaw portion indicates any definition should not include a requirement that the characteristics be prominent or distinctive.  Under Federal Circuit law, any construction must also allow for the claim to "cover additional, unlisted elements."  Finally, the court finds "bones of the face" to be an ordinary and customary meaning of skull, and "pertaining to the face" to be an ordinary and customary meaning of facial.  See New Webster's Dictionary and Thesaurus, 144, 356 (1991).  "Feature" is defined in the dictionary as "any part of the face," and as "a part of the face."  Id. at 147; Shorter Oxford English Dictionary, 935 (5th ed. 2002).

Looking to the claims, the specification, Federal Circuit law, and the dictionary, the court defines "skull facial features," as "pertaining to the bones of the face, including, but not limited to, a mouth feature and a nose feature, as shown in Figures 5 through 9 of the '972 patent."

## 2.  "Mammalian"

Hoodlums defines "mammalian" as "[t]he class of mammals or animals which suckle their young including but not limited to a human, dog and gorilla as shown in Figures 5 through 9 of the '972 patent."  (Doc. 37, Ex. B at 3.)  Redtail defines 'mammalian' as "[f]urred, warm-blooded animals with a backbone that nourish their young with milk secreted by mammary glands."  (Id.)  Both definitions are based on dictionary definitions.

The term "mammalian" is only found in claim 2, in reference to "mammalian facial features."  (Doc. 44, Ex. B at 8.)  In the

specification, the summary notes that the "invention is a welding helmet . . . molded in to the shape of a mammalian head.  Particular implementation includes a human skull, a bulldog, and a gorilla." (Id. at 7.)  Figures 5, 6, and 7, show the respective implementations. (Id. at 4.)  Under Federal Circuit law, any construction should include these preferred embodiments.  See On-Line Techs., Inc., 386 F.3d at 1138.  Only the plaintiff's definition includes a reference to these embodiments.  In addition, the defendant's definition includes a requirement that the mammal be furred.  Because humans are generally considered to have hair, and not fur, this definition does not capture the ordinary and customary meaning of mammalian.  E.g., Nicholas Wade, Why Humans and Their Fur Parted Ways, N.Y. Times, August 19, 2003, at F1.  Instead, the court finds "the class of mammals or animals which suckle their young," more accurately captures the ordinary and customary meaning of mammal.  See New Webster's Dictionary and Thesaurus, 234.

Looking to the claims, the specification, Federal Circuit law, and the dictionary, the court defines mammalian as "the class of mammals or animals which suckle their young, including, but not limited to, a human, dog, and gorilla, as shown in Figures 5 through 9 of the '972 patent."

**3. "Human"**

Hoodlums defines "human" as "[b]elonging to or having the qualities of man or mankind including but not limited to the human qualities shown in Figures 5, 8 and 9 of the '972 patent."  (Doc. 37, Ex. B at 3-4.) Redtail defines "human" as "[a]n erect bipedal primate mammal with the capacity for articulate speech and abstract reasoning."  (Id.)  Both definitions are based on dictionary definitions.

The term "human" is only found in claim 3, in reference to "human facial features."  (Doc. 44, Ex. B at 8.)  In the specification, the patent notes that Figures 5, 8 and 9 show one embodiment "having a human skull shape **34**."  (Id. at 7.)  Under Federal Circuit law, any construction should include the preferred embodiment.  See On-Line Techs., Inc., 386 F.3d at 1138.  Only the plaintiff's definition includes a reference to this embodiment.  In addition, the defendant's

definition includes a requirement that a human have the capacity for articulate speech and abstract reasoning. Infants and the disabled may lack the ability for articulate speech, but they are no less human because of it. Redtail's definition, therefore, does not capture the ordinary and customary meaning of the word "human." Instead, the court finds "belonging to, or having the qualities of, man or mankind" more accurately captures the ordinary and customary meaning of the word "human." New Webster's Dictionary and Thesaurus, 187.

Looking to the claims, the specification, Federal Circuit law, and the dictionary, the court defines human as "belonging to, or having the qualities of, man or mankind, including, but not limited to, the human qualities shown in Figures 5, 8 and 9 of the '972 patent."

## 4. "Facial Features"

Hoodlums defines "facial features" as "[p]ertaining to the face, including but not limited to the forehead, nose, mouth and cheekbones, etc. as shown in Figures 5 through 9 of the '972 patent." (Doc. 37, Ex. B at 4.) Redtail defines "facial features" as "[p]rominent and distinctive characteristics of the face." (Id.)

As noted above, the court defined "skull facial features" as "pertaining to the bones of the face, including, but not limited to, a mouth feature and a nose feature, as shown in Figures 5 through 9 of the '972 patent." When construing terms in a claim, there is a "presumption that the same terms appearing in different portions of the claims should be given the same meaning" unless the specification and prosecution history clearly indicate otherwise. Fin Control Sys. Pty, Ltd. v. OAM, Inc., 265 F.3d 1311, 1318 (Fed. Cir. 2001). In this case, the specification and the prosecution history do not provide a different meaning to the term "facial features."

Between "skull facial features" and "facial features," the latter lacks only the "skull" modifier. This context can be highly instructive; a term's usage in one claim often illuminates that same term's meaning in another claim. See Phillips, 415 F.3d at 1314 (explaining that the term "steel baffles" strongly implied that the term "baffles" did not inherently mean objects made of steel). Removing the

"skull" modifier removes the "bones of the face" phrase from the definition.

Mindful that identical terms should be given the same meaning even in different claims, the court defines "facial features" as "pertaining to the face, including, but not limited to, a mouth feature and a nose feature, as shown in Figures 5 through 9 of the '972 patent."

## 5.  "Nose Feature"

Hoodlums defines "nose feature" as "[t]he part of the face used for breathing and smelling, including but not limited to the nose features shown in Figures 5 through 9 of the '972 patent." (Doc. 37, Ex. B at 5.)  Redtail defines "nose feature" as "[p]rominent and distinctive characteristics of the organ forming the nostrils used for smelling and breathing."  (Id.)

The term "nose feature" closely resembles the previously defined terms "skull facial features" and "facial features."  In this case, "nose feature" is only found in claim 1, and the specification and the prosecution history do not provide any particular meaning to the term. The dictionary defines "nose" as "the organ for breathing and smelling." New Webster's Dictionary and Thesaurus, 261.  This definition captures the ordinary and customary meaning of the word "nose."  However, the addition of the word "feature" strongly suggests that the term "nose feature" includes more than just the definition of "nose." See Phillips, 415 F.3d at 1314.

Looking to the claims, the specification, Federal Circuit law, and the dictionary, the court defines "nose feature" as "the part of the face used for breathing and smelling, including, but not limited to, the nose features shown in Figures 5 through 9 of the '972 patent."

## 6.  "Mouth Feature"

Hoodlums defines "mouth feature" as "[t]he part of the face through which food is taken, including but not limited to the mouth features shown in Figures 5 through 9 of the '972 patent." (Doc. 37, Ex. B at 5-6.)  Redtail defines "mouth feature" as "[p]rominent and distinctive

characteristics of the opening in the head of an animal through which food is ingested." (Id.)

The term "mouth feature" closely resembles the previously defined terms "skull facial features," "facial features," and "nose feature." In this case, "mouth feature" is only found in claim 1, and the specification and the prosecution history do not provide any particular meaning to the term. The dictionary defines "mouth" as "an opening between lips of men and animals through which food is taken." New Webster's Dictionary and Thesaurus, 251. This definition captures the ordinary and customary meaning of the word "mouth." However, the addition of the word "feature" strongly suggests that the term "mouth feature" includes more than just the definition of "mouth." See Phillips, 415 F.3d at 1314.

Looking to the claims, the specification, Federal Circuit law, and the dictionary, the court defines "mouth feature" as "the part of the face through which food is taken, including, but not limited to, the mouth features shown in Figures 5 through 9 of the '972 patent."

## B.  Construing Design Patent Claims

Design patents, unlike utility patents, are typically claimed by virtue of their drawings. Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc), cert. denied, 129 S. Ct. 1917 (2009). After all, an illustration can convey a design far better than any description, and any description would likely be unintelligible without the benefit of an illustration. Id. Given these realities, "the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." Id. The court has no obligation to issue a detailed verbal description of the design when a verbal description is neither necessary nor helpful. Id. In fact, providing a detailed verbal description of the claimed design can be counter-productive; it risks overemphasizing particular features of a design, and risks focusing a jury's attention on the individually described features instead of on the design as a whole. Id. at 679-80.

On the other hand, the court may find it helpful to provide some written guidance in certain areas.  <u>Id.</u> at 680.  In particular, the court may find it useful to describe (1) how various features of the claimed design relate to the accused design and the prior art; (2) the role of certain conventions in the drafting of design patents (such as the use of broken lines); (3) the effect of any possible representations made during the prosecution history; and (4) how to distinguish between the ornamental and purely functional features of the claimed design.  <u>Id.</u>; <u>HR U.S. LLC v. Mizco Int'l, Inc.</u>, Civil Action No. CV-07-2394 (DGT)(JO), 2009 WL 890550, at *9 (E.D.N.Y. Mar. 31, 2009).  The question of how best to verbally describe the claimed design rests within the discretion of the trial court.  <u>Egyptian Goddess</u>, 543 F.3d at 680.  As a general matter though, the court should avoid the type of detailed verbal descriptions typically reserved for construing the claims of a utility patent.  <u>Id.</u>

Looking to <u>Egyptian Goddess</u>, it is unnecessary to provide a detailed verbal description of the claimed design.  Instead, the court will rely upon the illustrations found in the '260 patent. <u>See</u> <u>Acr'teryx Equip., Inc. v. Westcomb Outerwear, Inc.</u>, No. 2:07-CV-59 TS, 2008 WL 4838141, at *2 (D. Utah Nov. 4, 2008) (relying on the illustrations of the design patent and avoiding any detailed description of the claims).  These drawings provide a better representation of the claimed design - particularly given the risk that any verbal description might overemphasize certain features, ignore other features, and draw attention away from the design as a whole.  Indeed, Redtail's proposed description highlights these exact concerns.

In its brief, Redtail argues that the design patent can be described as "a welding helmet depicting a beaten and battered vampire skull with overly distended fangs that extend well below the lower teeth, numerous surface abrasions, numerous fissures and two large sutured cracks." (Doc. 44 at 6.)  The description makes no mention of the nose, the jaw, the upper and lower teeth, and the manner in which the lens is incorporated into the helmet.  The description mentions two sutured cracks, but fails to describe their length, thickness, or placement on the skull.  The description mentions fangs, but fails to

describe their curvature or placement in the mouth.  The description uses the term "vampire skull," but provides no further elaboration.  As Bram Stoker (<u>Dracula</u>), Anne Rice (<u>Interview with the Vampire</u>), and Stephanie Meyer (<u>Twilight</u>) can attest, there is no single way to envision or describe a vampire.  The same must be true of a "vampire skull."  Accordingly, the court construes Hoodlums' claim as "the ornamental design for a skull welding helmet, as shown in Figures 1 through 6 of the '260 patent."  <u>See</u> <u>Wing Shing Prods. (BVI) Co. v. Sunbeam Prods., Inc.</u>, No. 06 Civ. 3522 (RJH), 2009 WL 3151195, at *2 (S.D.N.Y. Oct. 3, 2009) (construing plaintiff's design patent by looking only to the figures in the patent).

## VII.  MOTION TO WITHDRAW AS COUNSEL

The law firms of Sherrill Law Offices, PLLC (Sherrill), and Harness, Dickey & Pierce, P.L.C. (HD&P), move to withdraw as counsel for Redtail International.  Sherrill argues that it has been unable to obtain payment from Redtail despite several months of trying, and has been unable to reach an agreement on a payment plan.  According to Sherrill, Redtail owes the firm over $74,000 in fees, and it has not been paid since June 2009.  Sherrill also argues that Redtail and the firm have been unable to agree on a strategy for managing and defending the lawsuit, which has hindered Sherrill's ability to effectively defend the case.  Finally, Sherrill argues that Redtail asked it to withdraw when the company told the firm to take no further action.  HD&P notes that Sherrill hired it merely to provide assistance on local rules and procedures.  Given this limited role, HD&P argues that it would be a hardship if it was unable to withdraw.  (Docs. 62, 63, 79 under seal.)

In response, Redtail points to an e-mail between itself and Sherrill.  In the e-mail, Redtail proposed to pay Sherrill $5,000 a month, and indicated that it wanted to proceed.  Redtail specifically denied that it asked Sherrill to withdraw.  (Doc. 69 under seal.) Hoodlums has no position on the motion to withdraw.  (Doc. 65.)

A client's failure to pay its legal fees provides good cause for counsel to withdraw.  <u>See</u> <u>RSG Inc. v. Sidump'r Trailer Co.</u>, No. 8:06 CV 507, 2009 WL 529233, at *2 (D. Neb. Mar. 2, 2009).  After all, a law

firm has no obligation to donate its time and efforts to a defendant. Universal-Polygram Int'l Publ'g, Inc. v. Prairie Broad. Co., Civil No. 09-CV-576 (PJS/RLE), 2009 WL 1955618, at *4 (D. Minn. July 7, 2009). On the other hand, a corporate defendant cannot proceed pro se. Id. Given these opposing standards, the court will schedule a status conference to determine whether Redtail and its counsel have come to any agreement on representation, and if not, whether Redtail would be able to retain different counsel, and whether withdrawal would disrupt the lawsuit. See id. The motion to withdraw is deferred until the status conference.

## VIII.  CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of plaintiff Hoodlums Welding Hoods, LLC, for leave to file its first amended complaint (Doc. 58) is sustained.

**IT IS FURTHER ORDERED** that the motion of plaintiff Hoodlums Welding Hoods, LLC, for claim construction (Doc. 39) is sustained.

**IT IS FURTHER ORDERED** that a hearing on the joint motion of Sherrill Law Offices, PLLC, and Harness, Dickey & Pierce, P.L.C., for leave to withdraw as counsel for Redtail International (Doc. 62) is set for Thursday, November 5, 2009, at 10:00 a.m.  A corporate officer of defendant Redtail International, LLC, shall attend the hearing.

_/S/   David D. Noce_
**UNITED STATES MAGISTRATE JUDGE**

Signed on October 28, 2009.